UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VENSURE FEDERAL CREDIT UNION, ) ) Plaintiff, ) ) v. ) ) NATIONAL CREDIT UNION ) ADMINISTRATION, ) ) Defendant. ) ) | Civil Action No. 11-785 (RMC) |

## MEMORANDUM OPINION

On April 15, 2011, National Credit Union Administration ("NCUA") placed Vensure Federal Credit Union ("Vensure") into conservatorship, pursuant to the Federal Credit Union Act, 12 U.S.C. §§ 1751 *et seq.* Vensure filed a petition to show cause challenging the conservatorship under 12 U.S.C. § 1751(h)(3), which requires "the Board to show cause why it should not be enjoined from continuing such possession and control." 12 U.S.C. § 1751(h)(3). Because a statutory ground existed for NCUA to impose a conservatorship, and because NCUA has established through the administrative record and an evidentiary hearing that its imposition was neither arbitrary nor capricious, the Court finds that NCUA has shown cause. The Court will deny Vensure's application to terminate NCUA's possession and control of its assets.

### I. FACTS

#### A. History

NCUA is a federal agency "that charters and regulates federal credit unions." Compl. [Dkt. #1] ¶ 2. Vensure is a federal credit union located and regulated by NCUA in the state of Arizona. *See* Compl., Attached Decl. of John Iorillo dated April 24, 2011 ("Iorillo Decl.") ¶ 2.

Vensure began its operations in 1955 as the Grand Adirondack Federal Credit Union ("Grand Adirondack") in the state of New York. *Id.* ¶ 5. In late 2008, Grand Adirondack changed management and moved to Florida. *Id.* ¶ 6. In March 2009, it again changed management and moved to Arizona. *Id.* ¶ 5–6. During its prior management, NCUA had noted several deficiencies, and in March 2009, Grand Adirondack signed a letter of understanding with NCUA to correct these deficiencies. *Id.* ¶ 6. In March 2010, NCUA found Grand Adirondack to be in full compliance and released it from the restrictions contained in the letter agreement. *Id.* ¶ 11. At that point, Grand Adirondack changed its name to Vensure. *Id.* ¶ 11.

### B. The Business of Vensure

Vensure is a credit union unlike most others because its revenue stems from non-traditional business activities. For the past two years, Vensure has "generated most of its revenues through providing automated clearinghouse ("ACH") services to Trinity Global Corp. ("Trinity"), a member client that itself processes payments for two of the world's largest online poker sites: PokerStars and Full Tilt Poker." *Id.* ¶ 2. "ACH payments are a means of payment by which banks send instructions to each other to move money across accounts." *Id.* "They are one of the most efficient methods of transferring money electronically." *Id.* The poker sites "allowed players to deposit money into their accounts held on poker sites, and to withdraw money from their individual bank accounts, via ACH transfers." *Id.* As an intermediary, Vensure received a fee per each ACH transaction. *Id.*

There can be a problem with ACH transactions, however, which is best explained by NCUA's chief complaint within its Confidential Statement of Grounds in Support of Order of Conservatorship:

2



See Administrative Record ("AR") [Dkt. # 14] at 9.[1]

Beyond ACH transactions, Vensure asserts that it was initiating new business activities in more traditional credit union areas; such as debit cards, internet banking, mobile banking, and a newly announced loan program.[2] *Id.* ¶¶ 20–23.

---

[1] All Administrative Record page numbers correspond to the upper right hand corner Bate Stamp Numbers within the record.

[2] During the May 11, 2011, show cause hearing, Mr. Iorillo, Vensure's CEO, testified that no loans had been actually processed when the conservatorship was imposed, although there had

### C. NCUA Regulation

Despite the March 2010 letter stating Vensure was in full compliance, NCUA noted within that same letter that "the [NCUA] plans to continue to work closely with [Vensure] to ensure the continued vitality of [its] credit union." *See id.* at 139. On June 30, 2010, NCUA issued an Examination Report, noting several problems with Vensure. *See id.* at 95–126 ("June Report"). A portion of the June Report noted that "the volume of wires, in numbers and dollars, at your small credit union is unusual and presents risk not only with the transaction themselves but also in the area of compliance," and that "[s]trategic risk is high due to reliance on one major source of income–Trinity Global Commerce Corp." *Id.* at 99–100. The June Report questioned the legality of Vensure's processing of internet gambling payments and requested legal opinions to support it. *Id.* at 101. The June Report also voiced a prescient concern regarding "the risk to capital that these short-term extensions of credit pose if Trinity were in bankruptcy proceedings, or became insolvent, and were unable to fulfill its credit obligations." *Id.* at 117.

On November 12, 2010, the General Counsel of NCUA found, after reviewing Vensure's proffered legal opinions regarding the legality of processing gambling-related payments, that "Vensure FCU's current activity of providing payment processing services for Trinity and Pokerstars.net is impermissible." *Id.* at 155 (Mem. from General Counsel to Director, Region V of NCUA). This legal opinion resulted in a January 18, 2011, Preliminary Warning Letter, directed at Vensure, which sought "to identify and provide formal notification of regulatory violations and unsafe and unsound practices requiring immediate correction." *Id.* at 157. The Preliminary Warning Letter noted three issues: (1) illegality of internet gambling-related payments, which NCUA directed

---

been one loan application filed.

Vensure to cease immediately; (2) fund transfers "that currently threaten [Vensure's] credit union's safety and soundness;" and (3) alleged conflicts of interest within management at Vensure and Trinity. *See id.* at 157–58.

Vensure responded on January 19, 2011, indicating its intent to review and clarify its legal opinions to support the legality of its business model, reliant on internet gambling-related payments. *Id.* at 161. On January 21, 2011, NCUA responded indicating Vensure must cease these activities "**immediately.**" *Id.* at 165 (emphasis in original). On January 25, 2011, Vensure requested clarification of any objections to its legal opinions and also questioned NCUA's authority to act under its Preliminary Warning Letter. *Id.* at 167. On January 28, 2011, Vensure again wrote to NCUA to report that its Board had decided to cease ACH processing activities related to online poker and had done so, despite a potential lawsuit for failure to give notice before cancellation. *Id.* at 167. However, on January 31, 2011, Vensure sent a follow-up letter noting it could not cease processing activities due to a contractual obligation to give 180 days notice to Trinity before ceasing ACH payments, therefore, "processing activity will recommence today," but will cease

> upon the sooner of (i) 180 days (effective from January 28th), or (ii) a determination by a competent legal authority – either the NCUA in an administrative hearing or a court – that the processing activity is illegal. Of course, if there is a contrary determination in the interim that the processing activity is lawful, the termination will be rescinded.

*Id.* at 179–80. On February 8, 2011, Vensure sent another letter to NCUA with additional legal opinions to support the legality of ACH transactions involving on-line games. *Id.* at 183. A February 17, 2011 letter from NCUA to Vensure acknowledged Vensure's legal opinions and its planned termination of services with Trinity. *Id.* at 189.

5

### D. U.S. Attorney Action

██████████████████████████████████████

██████████████████████████████████████ On April 15, 2011, the United States Attorney's Office for the Southern District of New York filed criminal and civil suits against, *inter alia*, PokerStars and Full Tilt Poker. *See* Iorillo Decl. ¶ 16. As part of its civil complaint, the United States sought forfeiture of funds held by PokerStars and Full Tilt Poker in various financial institutions, including Trinity's account at Vensure. *Id.* ¶ 16; Ex. 15 at 7. That same day, after a Board Meeting to discuss the fate of Vensure, NCUA imposed its conservatorship. *See* AR at 2–5 ("Order of Conservatorship") and 13–32 ("Hearing Transcript").

### E. NCUA Conservatorship

NCUA gave as grounds for its conservatorship:

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████



NCUA also provided further detail behind these reasons within its Statement of Grounds. Vensure contests the imposition of the conservatorship, arguing that the grounds given are arbitrary and capricious.

## II. LEGAL STANDARDS

### A. Standard of Review

Neither the statute itself nor the D.C. Circuit has given guidance on the appropriate standard of review for the imposition of a federal conservatorship. Because a certain lack of notice and *ex parte* process is inherent in imposing conservatorships, arguments have been made that a *de novo* standard of review is appropriate. *See In re Conservatorship of the Polish & Slavic Federal Credit Union*, 99-cv-2406 (JBW), 1999 U.S. Dist. LEXIS 10762 *4 (E.D. NY July 9, 1999); *Collie v. Federal Home Loan Bank Bd.*, 642 F. Supp. 1147, 1149-52 (N.D. Ill. 1986); *Haralson v. Federal Home Loan Bank Bd.*, 655 F. Supp. 1550, 1559-60 (D.D.C. 1987). The majority of circuits,

however, have decided that an "arbitrary and capricious" standard is appropriate.[3] *See In re Conservatorship of the Polish & Slavic Federal Credit Union*, 1999 U.S. Dist. LEXIS 10762 *4–5 (citing *First National Bank & Trust v. Department of the Treasury*, 63 F.3d 894 (9th Cir. 1995), *Franklin Savings Assoc. v. Office of Thrift Supervision*, 934 F.2d 1127 (10th Cir. 1991), *Woods v. Federal Home Loan Bank Bd.*, 826 F.2d 1400 (5th Cir. 1987), and *Guaranty Savings & Loan Assoc. v. Federal Home Loan Bank Bd.*, 794 F.2d 1339 (8th Cir. 1986)); *see also Gibralter Sav. v. Ryan*, 772 F. Supp. 1290, 1292 (D.D.C. 1991) (applying "arbitrary and capricious" standard). In allaying concerns with an *ex parte* administrative record, *i.e.* having no hearing or response from an affected credit union in the record, such courts have allowed "new evidence before the district court, but only for the limited purpose of determining whether the administrative record constituted a sufficient basis for the agency's decision." *See id.*

On May 11, 2011, this Court held a show cause hearing and allowed Plaintiff to contest the completeness of the administrative record by supplemental evidence. As noted within the May 11, 2011 show cause hearing, the question of the applicable standard of review is irrelevant because the Court finds NCUA has shown cause under both an "arbitrary and capricious" standard

---

[3] Vensure suggests that *Bingham v. First Central Credit Union* might provide a different, less deferential standard: "the sole inquiry on judicial review is whether a statutory ground existed for the FHLBB's appointment of a conservator or a receiver." 927 F.2d 282, 286 (6th Cir. 1991). As noted in *Citizens to Preserve Overton Park, Inc. v. Volpe*, however, "[s]crutiny of the facts does not end . . . with the determination that the Secretary has acted within the scope of his statutory authority[; it] requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Therefore, there is always a two-part inquiry in administrative decisions: (1) is there initial authority to make a decision; and (2) if so, is the decision made under that authority "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

of review and a *de novo* standard of review.[4]

### B. 12 U.S.C. § 1786

Under § 1786(h)(1), NCUA may "*ex parte* without notice, appoint itself or another as conservator and immediately take possession and control of the business and assets of any insured credit union." *See* 12 U.S.C. § 1786(h)(1). To do so, one of several factors has to be present; relevant here is "when the Board determines that such action is necessary to conserve the assets of any insured credit union or to protect the Fund or the interests of the members of such insured credit union." 12 U.S.C. § 1786(h)(1)(A).

### III. ANALYSIS

NCUA imposed a conservatorship upon Vensure, explaining that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AR at 6, Grounds for Conservatorship. Such an action is squarely authorized by the statute; the question for the Court is whether such a decision was "arbitrary and capricious" or unreasonable on a *de novo* review. The Court finds it was not. Considering the facts as they were understood on April 15, 2011–the date of the imposition of the conservatorship–such a decision was thoughtful, well-reasoned, and within the sound discretion of NCUA.

At the end of the evidentiary hearing on May 11, 2011, the Court made the following findings of fact:

---

[4] NCUA argues for an "arbitrary and capricious" standard, with which Vensure appears to agree: "Your honor, the only issue for, before the Court after this hearing is whether the NCUA's conservatorship action was arbitrary and capricious on the admin record they have provided." *See* Reply to Pl.'s Response to Court's May 11, 2011 Preliminary Findings ("NCUA Reply") [Dkt. # 35] at 7 n.2 (citing Transcript of May 11, 2011 at 107).

And so I find that NCUA was professionally anxious about the operation of Vensure both when it was Adirondack, but most particularly when it moved to Arizona and became Vensure without notice, without clarity as to who is in charge or what business it's in, *et cetera*, and then began examining that. And expressing its concern that the business model was inapplicable to what a credit union normally does . . . .

But I think NCUA gave Vensure sufficient notice of its concerns, of the nature of its concerns and its desire to require Vensure to change its business model which Vensure was slow to take as advice on which it should act perhaps for perfectly lawful reasons and valid reasons, I don't even question those. I just have to find it didn't read the tea leaves, it didn't take action, and it then left itself terribly at risk if something should happen to its access to Trinity's funds which indeed happened.

It didn't happen because of NCUA. It happened because of criminal enforcement or investigation. This is not to suggest that Trinity engaged in any criminal behavior, I have no idea. But there is a criminal investigation going on which led to an order to seize or freeze Trinity assets which meant Vensure didn't have access to them anymore.

The business model collapsed in a heartbeat. Since there were inevitably and always empty returns, as I've labeled them, meaning money handling that came back with insufficient funds, Vensure was left with the obligation to pay up on those and no access to Trinity monies, exactly the risk foreseen by NCUA and not previously experienced by Vensure . . . .

I cannot find that NCUA on this record acted arbitrarily and capriciously or irrationally or unlawfully in putting this credit union into conservatorship.

I make that conclusion regardless of whether I'm making original findings of fact which I have just kind of articulated or reviewing the record from which I am drawing the facts that I just articulated . . . .

It may be that had Vensure management been allowed to maintain the business through this perfect storm of events, they would have been able to hasten their attention to new lines of business. But they did not do so for months and months and months and I don't think can now be heard to cry wolf that they haven't been given that

opportunity once the perfect storm happened.

See NCUA Reply at 2–3 (citing Transcript of May 11, 2011 at 127–31).

The volume and amount of the ACH transactions had been a consistent, voiced concern of NCUA. *See* June Report (noting "the risk to capital that these short-term extensions of credit pose if Trinity were in bankruptcy proceedings, or became insolvent, and [were] unable to fulfill its credit obligations"); *see also* Preliminary Warning Letter (noting that fund transfers currently "threaten [Vensure's] credit union's safety and soundness"). NCUA suggested early that Vensure should change its business model to a more traditional credit union model. Vensure claims it was beginning to do so, but it waited too long and lost access to Trinity funds when they were frozen. The U.S. Attorney's action, coupled with Vensure's failure to diversify, placed Vensure at terrible risk. This type of scenario was an NCUA concern that had previously been voiced as early as June 2010. The agency predictably took action not only to protect Vensure and its customers, but also the National Credit Union Share Insurance Fund that would have funded any potential run.[5]

Assuming *arguendo* that the concern of ACH empty-return transactions was a valid ground for NCUA to act, Vensure reasons that the remaining grounds were without merit and thus the decision on conservatorship was arbitrary and capricious. *See* Response to the Court's Preliminary Discussion [Dkt. # 32]. As noted by Vensure, "[w]hen an agency relies on multiple grounds for its decision, some of which are invalid," a court may only "sustain the decision [if] one

---



11

is valid and the agency would have acted on that ground even if the other[s] were unavailable." *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 718 (D.C. Cir. 2006). The Court finds that NCUA has demonstrated that the freezing of Trinity's assets on April 15, 2011, *i.e.* the removal of Vensure's source of revenue and leaving Vensure to pay ACH returns with its own assets, was an emergency of such proportions and impact on Vensure that the agency would have acted on those grounds alone.[6] Further, its rationale is adequately noticed in the Statement of Grounds. *See* Statement of Grounds, AR at 7–11 (focusing on Trinity as Vensure's primary source of revenue and volatility of ACH transaction returns).

## IV. CONCLUSION

For the reasons stated above, NCUA has shown cause, pursuant to 12 U.S.C. § 1751(h)(3), that a statutory ground existed for it to impose a conservatorship and that such an imposition was not arbitrary, capricious, unreasonable, or unlawful. The Court will deny Vensure's request to enjoin the NCUA's conservatorship. A memorializing Order accompanies this Memorandum Opinion.

Date: June 24, 2011             /s/
                            ROSEMARY M. COLLYER
                            United States District Judge

---

[6] Vensure attacks the expression of embarrassment by an NCUA Board member that the U.S. Attorney froze Trinity assets before NCUA acted to place Vensure in conservatorship. Even so, the reasons for NCUA action remain legitimate and essentially proved by the sequence of events.

12